# EX PARTE ANDREWS.

THE Act of the Legislature entitled " An Act for the Observance of the Sabbath," (Stat. 1861, 655) prohibiting all persons, with certain exceptions, from keeping open their places of business on Sunday for the transaction of business, is constitutional.

Such act violates neither the first section of article one of the Constitution of this State, which declares—" All men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty ; acquiring, possessing and protecting property, and pursuing safety and happiness ; " nor the fourth section of that article, which declares that " The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this State," etc.

The Legislature under our system has power to repress whatever is hurtful to the general good; and is generally the exclusive judge of what is or is not hurtful—the only limitations being those prescribed in the Constitution.   Subject only to such limitations, the Legislature has power to pass laws regulating the relations, contracts, intercourse and business of society at large, and also of its particular members in respect to each other.

The clause in the Constitution guaranteeing the right of "acquiring property" does not deprive the Legislature of the power of prescribing the mode of acquisition, or of regulating the conduct and relations of the members of society in respect to property rights.

The Legislature has not only the power to regulate, but the power to suppress particular branches of business deemed by it immoral and prejudicial to the general good, as gambling, lotteries, etc.   The duty of government comprehends the moral as well as physical welfare of the State.

Section four of article one of our Constitution, as to the free exercise and enjoyment of religious profession and worship, prohibits all legislation which invidiously discriminates in favor of or against any religious system; but does not prohibit legislation upon subjects connected with religion, nor does it make void legislation, the effect of which is to promote religion, or even advance the interests of a sect or class of religionists.

The Act of 1861, "for the Observance of the Sabbath," is purely a civil regulation, and spends its whole force upon matters of civil economy, and was not designed to subserve any religious purpose.

This act does not violate the eleventh section of article one of the Constitution, declaring that all laws of a general nature shall have a uniform operation.

APPLICATION for Habeas Corpus.

Andrews, the petitioner, was tried and convicted in the Police Court of the City and County of San Francisco, for violating the Act of May 20th, 1861, entitled "An Act for the Observance of the Sabbath," by keeping open a store for the transaction of business on the first day of the week, commonly called Sunday, and sentenced to pay a fine of twenty dollars or be imprisoned in the county jail for ten days.   He failed to pay the fine, was imprisoned, and now applies to the Supreme Court for a writ of *habeas corpus*, alleging that the act for which he is imprisoned was no offense because the statute is unconstitutional.   The writ was issued, and on the return thereof the prisoner was remanded into custody.

*Daniel Rogers*, for Petitioner, contended that the act violated the first, fourth and eleventh sections of article one of the Constitution of this State.

*Thomas H. Williams, Attorney General,* and *E. D. Sawyer* and *S. F. & J. Reynolds, Contra.*

BALDWIN J. delivered the opinion of the Court—FIELD, C. J. and COPE, J. concurring.

This case involves the constitutionality of the act of the last session of the Legislature, entitled "An Act for the Observance of the Sabbath." (Stat. of 1861, 655.) The act is in these words:

"The People of the State of California, represented in Senate and Assembly, do enact as follows:

"Section 1. Any person who shall hereafter keep open on the first day of the week, commonly called Sunday, any store, workshop, bar, saloon, banking house, or other place of business, for the purpose of transacting business therein, except as hereinafter especially provided, shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than five, nor more than fifty dollars.

"Sec. 2. The provisions of this act shall not apply to the keeping open of hotels, boarding houses, restaurants, taverns, livery stables, retail drug stores, (for the legitimate business of each) or such manufacturing establishments as are necessarily kept in continued operation to accomplish the business thereof, nor to the sale of milk, fresh meats, fresh fish and vegetables.

"Sec. 3. Prosecutions for violations of this act may be either by complaint to a magistrate, or by indictment by a grand jury, and all fines collected upon convictions under this act shall be paid into the Common School Fund of the county.

"Sec. 4. This act shall be in force from and after the first day of August, 1861."

It is urged that this act contravenes the first and fourth sections of the first article of the Constitution of this State. The first section declares that all men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness. The fourth section asserts that the free exercise and enjoyment of relig-

ious profession and worship, without discrimination or preference, shall forever be allowed in this State.

These sections were commented upon by the several Judges of this Court at the April term, 1858, when the law of that year upon this general subject was under review.

The general principles announced by those sections are not peculiar to the Constitution of California. They are principles expressly asserted or impliedly recognized in almost every one of the Constitutions of our sister States. And in almost every State acts like the one under consideration have been passed; and in every instance, it is believed, where their constitutionality has been considered, it has been affirmed. And it is a circumstance of no slight significance that these laws, in States where they have not been assailed in Appellate Courts, for years have been recognized by all departments of the governments in which they exist, without a question of their validity. Probably such strong concurrence of opinion on one leading question affecting the general community, cannot be found in the history of American jurisprudence.

The following cases are express adjudications in favor of the binding force of such acts: *Specht* v. *Commonwealth*, 8 Barr, 312; *Cincinnati* v. *Rice*, 15 Ohio, 225; *Bloom* v. *Richards*, 22 Id. 387; *City Council* v. *Benjamin*, 2 Strob. 508; *Watts* v. *Van Ness*, 1 Hill, 76; *Shover* v. *State*, 5 Eng. 259; *State* v. *Almes*, 20 Mo. 214; *Hall* v. *State*, 3 Kelly, 18; *Bode* v. *State*, 7 Gill. 326; *Jones* v. *People*, 14 Ill. 196; *Story* v. *Elliott*, 8 Cow. 27; *McSweeny* v. *O'Donnell*, 5 Ala.

It is impossible for us to perceive how, upon principle, apart from all this authority, the act can be successfully assailed. It is conceded that, unless in some way restrained by the organic law, the Legislature has full power to pass laws regulating the relations, contracts, intercourse and business of the general society and of the particular members in respect to each other. The general duty of legislation is cast upon this department, and that duty is to be exercised for the general welfare; and of the policy of these laws the Legislature is made the judge. Accordingly, the codes of all States are full of statutes regulating contracts, declaring how they shall be made, how enforced, what agreements shall be valid, what

44

void, and under what restrictions and conditions property shall be acquired or titles vest; and in respect to particular avocations—those of lawyers, physicians, pilots, draymen, hackmen and others, legislation has prescribed in many instances the mode in which the members shall carry on their business. It is true, that by the first section already quoted the citizen is guaranteed the right of "acquiring property;" but this general clause does not deprive the Legislature of the power of prescribing the mode of acquisition, or of regulating the conduct and relations of the members of the society in respect to property rights. It is said that if the Legislature has the power to say that property shall not be acquired on one day of the week, or that day shall not be devoted to labor to acquire it, it has the same right altogether to interdict labor and prevent acquisition. But this would be to deny instead of asserting a power of regulation, for it would destroy what was to be regulated. It might as well be said that if a power of taxation to the extent of a dollar is allowed, this involves the right to take all the property of the citizen from him on pretext of taxation. So it might also be said by this process of reasoning to extreme cases, that a legislative requirement that contracts for realty should be in writing implied a power to enact that *no* contracts should be made, or if made, should be so evidenced—as by arbitrary, expensive and complex restrictions—as to render the attempt to make them impracticable.

Unquestionably, under our system, the Legislature has power to repress whatever is hurtful to the general good. This is a great purpose and end of all government. It is just as true that in our theory the Legislature must generally be the exclusive judge of what is or is not hurtful. Within this wide range of power, the Legislature moves without further restraint than the limitations which the Constitution has fixed to its action. If the Legislature declares that the merchant shall not keep his storehouse open on Sunday, this is not opposed to any limitation we have yet considered. It does not prevent the acquisition of property any more than the taxes laid upon that property, or the requirement that he shall obtain a license, or that he shall keep streets about his premises in repair. The Legislature does by this act declare its sense of

Ex Parte Andrews.

public policy; it asserts that the keeping open of the places of business on Sundays is injurious to the public welfare. Why then has it not the power by virtue of its general authority to do it? If from physical causes the carrying on of particular pursuits—as in certain mines or some mechanical branches which generate disease— is hurtful to health, it is within the power of Government to regulate the business so as to obviate or mitigate such results. And of both the evil and the remedy the Legislature is the judge; and why should the power be less or different when the evil is moral instead of physical? The Legislature has not only the power to regulate, but the power to suppress particular branches of business which it considers immoral and prejudicial to the general good, as gambling, lotteries, etc. The duty of government comprehends the moral as well as the physical welfare of the State; and in this instance it is asserted, on behalf of this law, that the passage of it is essential to the welfare of the people, both moral and physical. It is claimed that from physical causes men require respite from intellectual and physical labor in the proportion of one day's rest in seven; and that a law which enjoins this is not only for the aggregate good of the society, but for the benefit of all the members. It is said that the labor of six days, with this relaxation, is more productive, in the long run, than the uninterrupted labor of the week. It is said besides, that this law affords indirectly protection against oppression to *employés*, women, apprentices and servants; and that but for the law, men would keep open stores and shops because their neighbors did so, and that by competition, a sort of compulsion exists to violate the laws of health. These are considerations for the lawgiver and do not come within our province. We merely allude to them to show that the Legislature may consider and give effect to them; for it is impossible for us to see why that department may not protect and regulate labor and the relations of the different members of society so that one class may not injure a dependent class—the master the apprentice—the husband the wife—the parent the child —or why, if it be the interest of the whole society that no labor not necessary should be done on a given day, it may not prohibit it on that day.

It is contended with more earnestness that this act is opposed to.

the fourth section of the first article.  The language of that article deserves particular notice.  It contains a guarantee for the free exercise and enjoyment of religious profession and worship, without discrimination or preference.  We understand this to be an interdict against all legislation which invidiously discriminates in favor of or against any religious system. . It does not interdict all legislation upon subjects connected with religion; much less does it make void legislation, the effect of which is to promote religion, or even advance the interests of a sect or class of religionists.  On the contrary, the interests and even the rites of sects have been oftentimes protected by law, as by acts of incorporation of churches, exemption from taxation in some States, protection of meetings from interruption, and the like acts.  While the primary object* of legislation, which respects secular affairs, is not the promotion of religion, yet it can be no objection to laws, that while they are immediately aimed at secular interests, they also promote piety.  The Act of 1861 does not discriminate in favor of any sect, system or school in the matter of their religion.  It found a particular day of the week recognized by the large majority of the people of the country as a day consecrated to divine worship.  It was regarded by all of this large class as a day of rest, but not by all as a day set apart exclusively for divine worship or religious observance.  In selecting a day of rest from worldly labor, that day would seem to be most convenient, which, while it offended the scruples of none to observe, was most familiar to the usages, sense of propriety and sense of religious obligation of so many.  At least, the mere fact, as we have intimated, that the closing of shops on that day might be more convenient to Christians, or might advance their religious aims or views, is no reason for holding the law unconstitutional.  If Saturday had been chosen, a like objection might have been urged by different sects; and, probably, any other day of the week might have encountered objection from still other sects already existing or to arise.  The Act of 1861 requires no man to profess or support any school or system of religious faith, or even to have any religion at all; it does not require him to contribute money to any sect, or to attend any church or meeting.  It simply requires him to refrain from keeping open his place of business on Sunday.

The operation of the act is secular, just as much as the business on which the act bears is secular; it enjoins nothing that is not secular, and it commands nothing that is religious; it is purely a civil regulation, and spends its whole force upon matters of civil economy. The mere fact that this regulation takes effect upon a day which has been appropriated as a day of rest by the sanctions of a particular church, no more destroys the power of the Legislature to command abstinence from labor on that day, than the fact that if the Legislature appointed certain public business to be done on Saturday or Sunday—this would have been " discriminating " *against* the sects, according religious sanctity to those days.

The title of the act is relied on; it is, as has been seen, "for the Observance of the Sabbath." But even if the title of the act could be looked to as furnishing decisive evidence of its purpose, we see nothing in these words which indicate that the phrase was designed to imply a requirement of a religious character, or that the act was, in any respect, designed to subserve a religious purpose. The act itself in the body of it explains in what manner the day was to be observed, and shows that the object of it was only to require duties purely civic or secular. But even if this were otherwise, it would be difficult to maintain, as the Supreme Court of Pennsylvania observed in the case in 8 Barr, from the circumstance that the act shows one of the motives of its framers was to enforce a religious respect to the Sabbath, that this invalidated it on the ground of its unconstitutionality—the body and substantive provisions of the law showing a purpose and prescribing duties or forbidding acts merely secular in their character.

In our judgment, the Act of 1861 was merely the exercise by the Legislature of the municipal power of legislating for the welfare of the general society, by a law which inhibited what was considered injurious to the public weal; that it has a general power to pass laws for this end, and it rests with the objector to show some restriction or limitation on the power, and that this has not been done in this instance.

We do not deem it necessary to pursue the discussion. The opinion of Mr. Justice Field in *Ex parte Newman* (9 Cal. 518) discusses the main questions involved, and more fully expresses our views.

The other point urged has been decided in *People ex rel. Smith* v. *Judge•of the Twelfth District* (17 Cal. 547).

The prayer of the petition is denied, and the petitioner remanded to the custody of the Sheriff.·