Minshall, J.
John Powell, with others, was prosecuted in the police court of the city of Cleveland, on an information charging him in one count, with having on Sunday, May 16, 1897, participated in playing baseball, and, in a second count, with having exhibited a game of baseball playing, on certain grounds in the city — a charge for admittance having been made. The case was tried to a jury on a plea of not guilty. He was found guilty on both counts ; and, after a motion for a new trial made and overruled, was sentenced to pay a fine and costs of prosecution. The case was then taken to the court of common pleas on error, where the judgment was reversed and the defendant discharged on the ground that the section of the Revised Statutes, 7032«, under which the conviction was had, is unconstitutional. This section, among other things, makes it an offense, punishable by fine and imprisonment, for any one on the first day of the week commonly called Sunday, to participate in, or exhibit to the public in any “building” or on any “ground” in this state, “any baseball playing. ”
A bill of exceptions was taken by the prosecuting attorney to the ruling of the judge, and, on application, leave was given by this court to file the same.
The question presented by the bill is the validity of our Sunday laws. After so many years of acquiescence in their adoption, and, I might say, of almost unquestioned validity, these laws are now assailed on the ground that they violate the guaranties of personal and religious liberty contained in the'^rsTand seventh sections of our bill of rights. JEhese-questions may he better considered in their reverse order.
*340 The seventh section secures to every citizen of the state the fullest liberty of conscience in matters of religion: No one can be compelled to support or observe any form of worship against his consent. If the observance of Sunday as a day of rest and abstinence from all secular pursuits, had for its object the enforcement of a religious requirement, there are few lawyers or judges that would undertake to sustain the statute as a valid enactment. It would clearly contravene the section of the bill of rights just referred to. But that they are secular in purpose and not made to enforce any particular form of religious observance is sustained by a consensus of opinion in the decisions of the courts of this country, rarely found upon any other subject. Indeed there is not to be found a decision of a court of last resort to the contrary, except that of the state of California, which has since been overruled by the same court. Ex parte Newman, 9 Cal., 502, overruled in Ex parte Andrews, 18 Cal., 679. And though the day adopted for the observance of rest may coincide with the religious persuasion of a large part of the people, though not with all, is not' regarded as infringing upon the rights of the latter, since no religious observance of any kind is enjoined. Those who desire can devote the day to religious observances ; others may do as they see fit, so that they do not engage in such secular pursuits as, in accordance with the policy of the law, are prohibited. The policy of Sunday laws is based upon the observed fact, derived from long experience and the custom of all nations, that periods of rest from ordinary pursuits are requisite to the well-being, morally and physically, of a people. If there were no such regularly recurring periods, there is reason to *341 believe, that the masses would, become morbid in body and mind, crime would multiply, and degeneracy likely ensue. Rest recuperates the mind and body, gives new life and hope to the people, and cheerfulness and health attend renewed labor; and, as has been well observed, more, UDder these circumstances, can be accomplished in six days, than would otherwise be accomplished in seven. This is the foundation and policy of all statutes regulating the observance of a day of rest; and whether the day selected is one consonant to the religious views of a portion of the people or not, does not affect the validity of the regulation, where no religious observance is enjoined. Religious liberty does not consist in the right of any sect to oppose its views to the policy of a government. Such a claim would end in simple intolerance of all not in accord with the sentiments of the particular sect. Those who, as a matter of religious faith, observe the seventh day of the week are not prohibited from doing so; but they cannot insist that others shall do so, nor refuse to observe the day fixed by the state for secular reasons. There are sects who believe in polygamy, and adopt it as a part of their religion. But, however, conscientious they may be in entertaining such notions, if one of them should come into Ohio, and bring with him his wives, his religious scruples would not protect him on an indictment for bigamy.
The question however, is not an open one in this state. In Bloom v. Richards, 2 Ohio St. 387, decided in 1853, the whole subject was fully considered. Whilst holding that the making of a contract is not within the meaning of the term “common labor,” the statute as thus construed, was sustained *342 as a secular regulation, that in no way interferes with any one’s rights of conscience. Thurman, J., in delivering the opinion said that “Acts evil in their nature, or dangerous to the public welfare, may be forbidden and punished, though sanctioned by one religion and prohibited by another; but this creates no preference whatever, for they would be equally forbidden and punished if all religions permitted them. Thus, no plea of religion could shield a murderer, ravisher, or bigamist; for community would be at the mercy of superstition, if such crimes as these could be committed with impunity, because sanctioned by some religious delusion. ” “We are then, ’ ’ he said, ‘ To regard the statute under consideration as a mere municipal, or police regulation, whose validity is neither strengthened or weakened by the fact that the day of rest it enjoins is the Sabbath day. Wisdom requires that men should refrain from labor at least one day in seven, and the advantages of having the day of rest fixed, and so fixed as to happen at regularly recurring intervals, are too obvious to be overlooked. It was within the constitutional competency of the General Assembly to require the. cessation of labor, and to. name the day of rest. It did so by the act referred to, and, in accordance with the feelings of a majority of the people, the Christian Sabbath was very properly selected. But, regarded merely as an exertion' of legislative authority, the act would have had neither more nor less validity had any other day been adopted. ’ ’ He then cites a number of cases, particularly Specht v. The Commonwealth, 8 Ban., 312, and Charlston v. Benjamin, 2 Strobh, 508, which fully support his opinion as to the secular character of Sunday laws and the policy on which they rest.
*343 Among the eases that may be cited, sustaining the enactment of Sunday laws, in addition to those already referred to, are the following: Watts v. Van Ness, 1 Hill, 76; Shover v. State, 5 Eng., 259; State v. Elmer, 20 Mo., 214; Hall v. State, 3 Kelly, 18; Bode v. State, 7 Gill, 326; Jones v. People, 14 Ill., 196; Story v. Elliott, 8 Conn., 27; Commonwealth v. Har, 122 Mass., 40; People v. Havnor, 149 N. Y., 195; Hennington v. State, 90 Ga., 396, affirmed by the Supreme Court of the United States, 163 U. S. 299. They are also fully collected and well considered in the opinion of Fisher, J., in State v. Goode, 5 Nisi Prius Rep., 179. And it is proper to call attention to the able dissenting opinion of Field, J., in Ex Parte Newman, 9 Cal., 518, since the decision of the majority in this ease was overruled by an unanimous decision in the subsequent case of Ex Parte Andrews, 18 Cal., 679; and the law of that State “ for the better observance of the Sabbath,” sustained, though the same Constitutional objections were urged against it, that are made in this case, the provisions of their bill of rights being in this regard substantially the same as our own.
But it is further claimed that the statute violates the guaranty of personal liberty contained in the first section of the bill of rights. This, though one of the great maxims of our form of government, has never been regarded as limiting the power of the legislature in the enactment of such good and wholesome laws as are required to secure the peace, health and good order of society The learned Sedgwick in his work on Statutory and Constitutional Construction, 153, commenting on the provisions usually contained in the bill of rights of our American Constitutions says: “They *344 are of no little value as safeguards against error and injustice; but I think they must be regard ed rather as guides for the political conscience of the legislature, than as texts of judicial duty. Important as they are, still they are expressed in such general terms as necessarily to admit of great and prominent exceptions. As to the enjoyment of life and liberty, property, and the pursuit of happiness, all these rights are daily interfered with by the legislature, without scruple for the common welfare. I suppose it be must admitted that, in a judicial sense, these clauses could not easily be made available.” Liberty, as understood in this country, is not license, but liberty regulated by law. The personal liberty of every man is subject to such reasonable regulations as, in the wisdom of the legislature, are regarded necessary to promote, not only the peace and good order of society, but its well-being. This objection to the law is well answered in the clear and forcible language of Justice Field, in the dissenting- opinion before referred to. “If,” he says, “it be admitted that the legislature possesses the right to restrain each one in his freedom of conduct only so far as is necessary to secure protection to all others, from every species of danger to person, health, and property, .no inference can be drawn against the validity of the act under consideration. The character and mode of protection, and what is dangerous to the person, or to health and property, must necessarily be left to its determination, and in the first section of the Constitution no inhibition to the exercise of its power in this respect can be found. The prohibition of secular business on Sunday is advocated on the *345 ground that by it the general welfare is advanced, labor protected, and the moral and physical well-being of society promoted. The legislature has so considered it, and the judiciary cannot say that the legislature was mistaken, and, therefore, the act is unconstitutional, without passing out of its legitimate sphere, and assuming a right to supervise the exercise of legislative discretion in matters of mere expediency,” and which he proceeds to say cannot be done.
We have carefully considered the able argument of counsel for the Judge whose ruling is under review. The gist of his argument is that the purpose of the act is to enforce the observance of Sunday as a religious requirement; and calls attention to the claims and views of those most zealous in its enforcement. No doubt, many who advocate Sunday observance, particularly the'Christian ministry, do so from the persuasion that our Sunday laws are designed as religious observances only, and insist that they should be more rigidly enforced that the people may be more accessible to the influences of the Christian pulpit. However desirable this may be from the Christian standpoint, it is certain that it is not in the power of the legislature to accomplish this by any direct legislation, so long as religious liberty is guaranteed, as it is, in our bill of rights. This was settled by the case of Bloom v. Richards, supra. The fact, however, that such views are entertained of the purpose of the law and may have controlled the votes of many who supported it in the legislature, cannot affect its real character and proper construction. The purpose and object of a law are to be determined by the language applicable to its subject-matter. Speaking to the same point, Baldwin, J., in Ex parte *346 Andrews, 18 Cal., 685, said: “The act itself in the body of it explains in what manner the day was to be observed, and shows that the object of it was only to require duties purely civic or secular.” A law enacted for sufficient reasons of a secular nature — as the public health, cannot be held invalid, because there is a variety of religious notions upon the subject. Nor can the state be prevented from adopting certain civil regulations, recommended by a wise public policy, simply because found to be in accord with the teaching of some religion. There is probably no religious observance that could not be enforced as a secular duty, without violating the guaranty of religious liberty, where there are sufficient secular reasons for doing so, independent of what is ordained as a matter of religion. In general, where there are secular and religious reasons for the same observance or law, the observance or law may be adopted as a civil regulation by the legislature for the attainment of the secular purposes; and when enforced for these purposes alone, no one can complain of it, simply because the observance or law finds support in the precepts of some religion. It is enjoined for secular and not religious reasons. It might be questioned whether the Jewish Sabbath was prescribed purely as a religious observance and without any regard to the temporal welfare of the people. It must be remembered that the Jewish government was in the nature of a theocracy, and its precepts were given without much regard to what was of a spiritual nature, and what was secular and related to the temporal government of the people alone.

Exceptions sustained.