[No. 10,711.—In Bank.]
March 10, 1882.

## EX PARTE KOSER.

SUNDAY LAW—CONSTITUTIONAL LAW—POLICE POWER—HEAD LINES OF TITLES AND CHAPTERS OF CODES—STARE DECISIS—FREEDOM OF RELIGION.—The Sunday law (§§ 300, 301 Penal Code) is not unconstitutional. (McKINSTRY, J., ROSS, J., and SHARPSTEIN, J., dissenting.)

ID.—ID.—ID.—ID.—ID.—ID.—CASE DISTINGUISHED.—*Ex parte Westerfeld*, 55 Cal. 550, distinguished.

APPLICATION for a writ of *habeas corpus*.

CAL. REPS. LX—12

*T. H. Laine,* for Petitioner.

The sole question to be considered and determined in this case may be stated in a few words, viz: *Is the law found in the Penal Code of this State at sections 300 and 301 constitutional ?* The petitioner affirms that it is not.

The Penal Code was passed April 14, 1872, and repealed all Sunday laws then existing. This Code had a chapter in it composed of fragments of the various statutes we have called attention to, together with fragments of other laws before that time passed, that had no reference to Sunday either as a day of rest or a day devoted to religious matters.

That chapter is Chapter 7, of Part 1, Title 9, of this Penal Code, and bears this title, viz: "Of Crimes against Religion and Conscience, and other offenses against Good Morals." It consisted of nine sections—a most heterogeneous mass of matter. We have no State Religion, and consequently no crimes against religion cognizable by the State. A crime against conscience would also be something of a curiosity.

A law is a rule of action or of civil conduct, and not so many pages, lines or sections, in a statute book ; and every such rule is a distinct law. In this chapter of nine sections, therefore, there are contained seven distinct laws on seven distinct subjects, viz: 1. Sec. 299—a law against improper amusements on Sunday where liquors are sold. 2. Secs. 300 and 301—a law against keeping open places of business on Sunday. 3. Sec. 302—a law against disturbing religious meetings. 4. Sec. 303—a law against the sale of liquors at theatres, etc., by women. 5. Secs. 304 and 305—a law against the sale of liquors at camp meetings. 6. Sec. 306—a law against procuring females under seventeen years old to play musical instruments in certain public places. Sec. 307—a law against procuring a female under seventeen years old to exhibit herself for hire.

We are prepared to admit that under the old Constitution, and perhaps under the new, a Sunday law could be enacted that the Courts would uphold. We concede that by an overwhelming weight of authority such a law can be passed without interfering with the rights of conscience or religious liberty. But we insist that such Sunday laws are all founded

upon a different theory than the one under consideration; that is to say, that they are all founded either upon the theory that the day should be observed as a holy day, set apart to religious duties, upon which no secular business should be done, unless it be works of necessity or charity; or upon the theory that there should be a day of rest set apart and maintained under the police power of the State. But this law is of neither character. It does not devote the day to any sacred purpose; it does not prevent the doing of any secular business whatever; nor does it give, or pretend to give, rest to man or beast. The crime it proposes to create does not consist in opening places of business nor in keeping them open, nor does it consist in performing labor or doing business; but in keeping open certain places of business for the *purpose* of doing business; and in its exceptions labors of necessity and charity are overlooked and unprovided for.

This code, by its heading or title of the chapter, shows that it was not intended to set apart a day of rest nor a day on which secular business was to be prohibited. It declares no business nor the doing of any, wrong or illegal, on that day. It is, therefore, in no just sense a law, but an unauthorized and wanton legislative interference with the reserved rights of the citizen, and as we submit, in violation of the first section of the bill of rights of the old Constitution, which says " All men are by nature free and independent, and have certain *inalienable* rights, among which are those of *enjoying* and defending life and *liberty*, acquiring, *possessing* and *protecting* property, and *pursuing* and obtaining *safety* and *happiness*," and of these rights this law is an abridgement for no just or legal cause.

We submit that the law is unconstitutional and void, as being in open and direct violation of § 25 of Art. ii, which reads, so far as material here, as follows: " Sec. 25. The Legislature shall not pass local or special laws in any of the following enumerated cases, that is to say, * * second, for the punishment of crimes and misdemeanors." It is most clearly a special law within the meaning of our constitution, as settled by this Court in *Ex parte Westerfield*, 55 Cal. 550. We defy any one by any course of fair reasoning to sustain this law, if the bakers' Sunday law in that case considered was a

special law, such as our Constitution forbade the enacting of; and we have no doubt that it was. This law, we submit, is much more bald in that respect than the bakers' law.

Again, as to its being a special law, see the clear statement of Justice Myrick on that point, found in *Earle* v. *S. F. Board of Education*, 55 Cal. 494–5.

But this law is equally unconstitutional and void as being in plain and direct violation of the latter clause of Art. 1 Sec. 21. The whole section reads:

" No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the Legislature; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens."

Privilege, special, means pertaining to or constituting a species or sort limited in range, means to grant some particular right or exemption, to invest with a peculiar right or immunity, as to privilege a representative from arrest, to privilege officers and students of a college from military duty. Immunity means freedom from arrest and the like, or to give a peculiar privilege. Now this statute divides the citizens, or people of the state into various classes, viz: store keepers, bar keepers, hotel keepers, boarding house keepers, barbers, bath keepers, saloon keepers, bankers, market keepers, restaurant keepers, livery stable keepers, and retail drug store keepers, and it grants to some of these classes the privilege of keeping their places open on Sunday for purposes of business and gives to them also an immunity from arrest, while it denies the same privilege to others and subjects them to arrest. (Cooley's Constitutional Limitations, 4th Ed. 488, 494.)

That this law binds no section of the great body of the people is evident from the fact that while it was enacted much as it now stands as early as 1858, yet during all these years it has remained a dead letter on the statute book. The reason is that it is opposed to the letter and spirit of our institutions. And even now the great mass of the people have no respect or love for it. Only a few belonging to a single class, namely, temperance people, so called, in some of the small towns and out lying places, are making a clamor about it.

*Garber, Thornton & Bishop*, also for Petitioner.

This case falls within the class which are to be decided upon principle, rather than according to the mere weight of authority.   This is so even as to the invocation of the doctrine of *stare decisis* based upon prior adjudications by this Court—*a fortiori*, as to the effect to be given to the decisions and opinions of other Courts and Judges.   (*Willis* v. *Owen*, 43 Tex. 48; *Houghton* v. *Austin*, 47 Cal. 666.)

The law in question, even if general and uniform in its operation, would have been unconstitutional.   So far as adjudication has been had in this State, this question has been decided both ways; and we submit that, authority aside, the better reasoning is that of *Ex parte Newman*.   The question is summed up by Cooley, who is quoted as authority for the validity of the law in the last California opinion.   But we submit that a fair construction of the text of Cooley rather leads to the inference that such laws are *only* sustainable *on authority*, and that if the question were *res integra*, and the point to be decided upon principle, the opposite conclusion would be reached.   For after stating the two grounds upon which laws prohibiting ordinary employments on Sunday, are to be defended, viz : First, as laws against the desecration of the *Christian Sabbath*, and, second, as an exercise of the police power establishing sanitary regulations, he says: "The Supreme Court of Pennsylvania have preferred to defend such legislation on the second ground rather than the first ; but it appears to us that if the benefit to the individual is alone to be considered, the argument against the law which he may make who has already observed the seventh day of the week, is *unanswerable*."   And as to the first ground, he says : "But the Jew who is forced to respect the first day of the week, when his conscience requires of him the observance of the seventh also, may plausibly urge that the law discriminates against his religion, and by forcing him to keep a second Sabbath in each week, unjustly, though by indirection, punishes him for his belief."   Then he adds, however, that on this ground, the law must be based upon the ground that it only requires the proper deference and regard which those not accepting the common belief must pay to the pub-

lic conscience, and that *upon that ground,* these laws are supportable *by authority.*   (Cooley Con. Lim., p. 594.)

It seems to us necessary to a clear understanding of these questions, to keep distinct the different grounds upon which these Sunday laws have been sustained, and that only confusion can result from the blending of them together in one view.   If a law, for instance, were enacted requiring a cessation of all labor on Monday and Tuesday of each week, according to the views of Judge Cooley, it could not be sustained at all, because the *only* ground upon which he puts the validity of Sunday laws would be entirely wanting.   According to him the argument of those who chose to observe some other day of the week, against such a law would be unanswerable.   On the other hand, in many of the cases usually cited in support of the constitutionality of these laws, the opposite view is taken.

In so far as it may be urged that this law derives any support from the fact that it sets aside Sunday, rather than another day as a period of enforced idleness, we submit that both on principle and authority, at this day, the contention cannot be deemed even plausible ; and that what Judge Cooley calls a plausible argument is in fact an unanswerable one— such a law does give a preference to our religion, and does indirectly punish all but a certain favored class for their belief.

But, as is said by Mr. Justice McKinstry, by some Courts "these laws have been sustained as simply requiring a periodical cessation of labor—the power to pass them resting upon the right of the Legislature to pass laws for the preservation of health and the promotion of good morals."

And Mr. Justice Field, in *Ex parte Newman,* sustains the law as a proper exercise of the police power, saying that the Legislature can pass laws for the preservation of health and the promotion of good morals—that capital unrestricted by law will exact so much work as to injure the laborer—that the fact that the civil regulation accords with the divine law and the opinions of the majority, affords no argument against it—that the law against homicide is not less wise, because the Divine Command is "Thou shalt do no murder ;" and that

with the motives of the Legislature, the Courts have nothing to do.

Following out this line of reasoning, we suppose, it must be held that the Legislature may enact that whenever a man is struck on one cheek he must turn the other—that it shall be a misdemeanor to swear by the earth, or to give alms except in secret, or to pray standing in public, or to wear golden ornaments, or to invite to a dinner any but the poor, the maimed, the lame and the blind. For each and·all of these things, it might as well be urged that they came within the police power, as that such power justifies the enforced observance of Sunday as a day of rest. If it were to-morrow proposed to compel by law the cessation of all business on Monday and Friday of each week, would any Court uphold such a statute ? And yet, the religious sanction aside the difference between such a law and the Sunday law, would only be one degree. If it once be admitted that the Legislature has power to thus provide for the public health and good morals, where is the limit to its exercise ? And if the public health can thus be provided for, what the objection to laws prohibiting the use or the culture of tobacco, or even tea or coffee, as injurious to health—to laws regulating the number of hours in each day, during which grown men of sound health may labor ? If the question were of the first impression, and entirely unaffected by religious feelings, and it were proposed now for the first time to set apart each Monday as a day of rest, would not all agree, as a plain dictate of common sense, that such a law does not fairly fall within the limits of the police power—that it is not necessary for the public health or morals that any such a restriction on the freedom of individuals should be imposed—that such a regulation is entirely outside the scope of legislative power ? That there would be just as much propriety in enacting the number of hours out of the twenty-four during which all should sleep, on pretense of compelling a restoration of exhausted energies, as in prescribing the number of hours in every week during which all must refrain from their ordinary avocations ?

We think it is fair to infer from his later opinions that Judge Field would now materially modify the views expressed by him in *Ex parte Newman;* (*Missouri* v. *Illinois,* 4 Otto, 142.)

The pretext is that experience has demonstrated that one day's rest in seven is needful to recuperate the exhausted energies of body and mind. In point of fact, experience has demonstrated no such thing. How much, and when a man should rest, depends upon the kind of work he does and his habits, and a variety of considerations. But this law does not compel this weekly cessation of labor. If it is to be justified as resting upon a legislative adjudication that one day's rest in every seven is necessary—if that is the *principle* upon which it rests, then the Court, in order to sustain it on that ground, must be able to see that the principle is carried out in the enactment. For example, if any class of the community can be said to stand in need of this fatherly protection of the law, it is the operatives in factories, who, as Judge Field says in *Ex parte Newman*, are the slaves of capital. But by this statute they are left absolutely unprotected. From the whole scope of the statute, it is perfectly evident that the ground upon which it is sought to be sustained as a police regulation, was entirely absent from the minds of the framers. It was as it purports to be, a law to punish crimes against religion and conscience—to compel, in the language of Judge Cooley, a decent deference and respect to the public conscience, and to prevent the desecration of a day which a particular creed declares shall be remembered to keep it holy. Consequently its prohibitions are directed, not against working too much, not against the failure to recuperate the exhausted energies by needed rest; but against the publicity and openness with which that work may be prosecuted. As Judge Field says, had the statute contemplated a mere sanitary regulation, it would have been made applicable to all who might be injured by undue application to labor—at the least, the exceptions would only have embraced those who, from the nature of their avocations could take the needed rest at other periods, or whose ministrations on Sunday are absolutely imperative. As said in *Ex parte Maguire*, the law-making power of the State is ample to make laws affecting all sects alike, and not inhibited by the Constitution, which will accomplish the object so much talked about—the prevention of a too incessant application to worldly affairs.

The provisions of the new Constitution against special leg-

islation apply with equal force to statutes passed prior to its adoption, as to those subsequently adopted. (*Matter of Oliver, etc.*, 21 N. Y. 12; *Bensley* v. *Ellis*, 39 Cal. 313.)

The evil to be guarded against—the mischief to be remedied, was not the mere act of voting for such laws, but the partial and unjust operation of such laws when passed. What the framers of the Constitution intended was to prevent the unfairness and injustice resulting from the unequal operation of the laws, and every special law, whether passed before or after the adoption of the Constitution, was equally within its intent and spirit. Equally too within its letter. It says, the Legislature shall not pass special statutes, and all statutes heretofore enacted inconsistent with this provision shall be void. Is not this substantially the same as saying, the provisions and inhibition of this Constitution shall equally apply to existing as to subsequent statutes ? What motive could the framers of the Constitution have had in denying to this provision a retrospective operation ? If the nullification of the existing statute, could divest a vested right, or impair the obligation of a contract, or otherwise work an injustice, the case might be different; but all such consequences are guarded against by other provisions. (*Mitchell* v. *Hagenmeyer*, 51 Cal. 108; Broom's Maxims pp. 35–6; 10 Otto, 307; 13 Id. 389.)

The only argument advanced, we believe, in the cases cited to show that existing special laws are saved, is that it could not have been the intention to annihilate at one fell swoop the vast body of existing special legislation. But why not ? If it was well to prohibit future Legislatures from perpetrating these enormities, was it not equally wise to abolish those already perpetrated, saving only as is done, vested rights, etc.?

The statute is in conflict with the provisions of the State Constitution— that all laws of a general nature shall have a uniform operation—and with the Fourteenth Amendment to the Constitution of the United States.

In so far as experience has demonstrated that the public health demands exactly one day's rest in seven—in so far as this legislation is based upon and justified by this consideration, the occasion, the justification, and the legislative action, are

all general in their nature. It is not because excessive devotion to business is deleterious in one locality, under particular circumstances, or to particular classes or individuals; but because all are so constituted as to require this relaxation, that this law is to be submitted to. It must, then, have a uniform operation, or it can legally have no operation.

Now, it seems to us that in determining whether its operation is uniform, we need only ask whether it bears upon all who fall within the reasons alleged for its enactment. If the only reason which can be given to justify the law be one which equally applies to every member of the community, then it can not fairly be said to operate uniformly, unless it operates equally and impartially upon every member of the community. If the reason be a religious reason—if the law is to be upheld because it is within the power of the Legislature to compel the observance of the divine command to remember this day and keep it holy, then all should be compelled alike. And so if the object be the public health. (16 Wall. 97; *Pell* v. *Newark,* 40 N. J. L. 80; *Holden* v. *James,* 11 Mass. 396; *Kelley* v. *The State,* 6 Ohio St. 272; *Mayor* v. *Dearman,* 2 Sneed. 122; *Wally's Heirs* v. *Nancy Kennedy,* 2 Yerg. 554; *Bank* v. *Cooper,* 2 id. 599; 2 Coke's Institute, 51; Cooley Con. Lim. 492; *Omnibus R. R. Co.* v. *Baldwin,* 6 P. C. L. J. 763; *Parrott's Case,* 5 P. C. L. J., supplement.) We have seen that while a formidable looking array of authorities can be marshalled in support of Sunday laws of uniform operation, that the supporters of such laws are by no means agreed on any one principle upon which they can be rested; and that Judge Cooley, who is the most recent and generally esteemed the most authoritative exponent of this branch of the law, hardly attempts to justify such legislation on principle, and so far as he goes, repudiates the idea that it is within the police power, and puts it on the sentimental and religious idea connected with the observance of the Sabbath as a matter of conscience. The thought thus avowed by Judge Cooley, though not always put forward, underlies and accounts for the whole course of judicial action on this subject. As a rule, the Judges have carried with them to the bench the impressions of early religious and Christian training. We all know how difficult it is for any one to divest himself

entirely of the bias thus resulting—how slowly the most enlarged and enlightened understandings have practically embraced and carried out the philosophy of perfect religious freedom and toleration. We do not have to go very far back to the times when the best men justified and enforced laws working all kinds of disqualification, punishment and disfranchisement for nonconformity in matters of conscience.

But it is time that the law shall take the most advanced ground on these questions, and that Courts shall recognize the fact that the cause of true religion is always injured and never advanced by calling to her aid the sanctions and punishments and rewards of secular authority.

*J. H. Campbell and John Reynolds*, for the People.

We do not understand that the petitioner makes any question that the law, as it stood at the adoption of the present Constitution, was constitutional and valid, as held by repeated decisions of the Courts of last resort in this and other States. And as to that proposition we are satisfied to submit the case upon the opinion of the learned Chief Justice in *Ex parte Burke*, Cal. and the cases there cited.

It is claimed, on the part of the petitioner, that the law under which he was convicted consisted of Sections 300 and 301 of the Penal Code, and that the amendment to Section 301 in 1880, operated as a re-enactment of both sections.

The Act of 1880, amending Section 301, makes no reference in its title to Section 300, and deals only with the exception in Section 301, adding a *proviso* which limits the exception, as to certain of the classes named in the section amended.

We submit, if the Legislature had no power under the present Constitution to pass Section 301, its action was void, and it left the Code as it stood before. Or if, as claimed, Section 301 could not be amended as it was, without also re-enacting Section 300, then the Act of 1880 was void for want of a proper title, and the Code was unaffected by it. (*Leonard* v. *January*, 7 Cal.) The law under which petitioner was convicted, whether it consists of Section 300 alone, or of the two sections together, either as they stood before, or as they existed after the amendment of. 1880, is not violative of any provision of the present Constitution, even if

the law had been passed under it or re-enacted after its adoption.

The law is not local or special. It certainly is not local, for it operates alike all over the State. It is not special in the sense in which that term is used in the Constitution. A general law, uniform in its operation, is one which is public, and affects alike all persons in the class to which it relates. There is nothing in conflict with this in either of the opinions in *Ex parte Westerfield*, 55 Cal. 550. There the Act was held to be special because it discriminated between certain persons of the same class and pursuing the same business.

"Special," is opposed in signification, to "general." And so when we get the definition of a general law, whatever comes within that definition is not a special law. That this is a general law operating alike all over the State, *quod* the classes of persons to which it applies, is made very clear by the opinion of the learned Chief Justice in *Ex parte Burke*.

Nor does this statute grant any privilege or immunity to any citizen or class of citizens which, upon the same terms and under like circumstances, may not be enjoyed by all citizens.

Article i, Section 21, of the present Constitution, is but an express definition of Section 11, Article i, which is the same as the corresponding section of the old Constitution. (*Brooks* v. *Hyde*, 37 Cal. 377.)

THORNTON, J.

The petitioner, Koser, was convicted of keeping open a saloon on Sunday, November 9, 1881, for the purpose of transacting business therein, contrary to the provisions of Section 300 of the Penal Code. He was sentenced under this conviction and imprisoned, and sued out this writ to be discharged from such imprisonment as unauthorized by law.

The legality of the imprisonment depends on the constitutionality of the laws known as the Sunday laws, which are comprised in Sections 300 and 301 of the Code above cited. These sections are as follows:

"300. Every person who keeps open on Sunday any store, workshop, bar, saloon, banking-house or other place of business for the purpose of transacting business therein, is punishable by fine not less than five nor more than fifty dollars.

" 301.   The provisions of the preceding section do not ap-
ply to persons who, on Sunday, keep open hotels, boarding
houses, barber shops, baths, markets, restaurants, taverns, liv-
ery stables or retail drug stores, for the legitimate business of
each, or such manufacturing establishments as are usually
kept in continued operation; provided, that the provisions of
the preceding seetion shall apply to persons keeping open
barber shops, bath houses, and hair-dressing saloons, after
twelve o'clock M. on Sunday."

Most of the questions arising in this case were passed on
in *Ex parte Andrews,* 18 Cal. 678.   The statute considered in
the case cited was for the greater part the same as the sec-
tions of the Penal Code above quoted.   The principal differ-
ence between them is the addition of the proviso in Section
301, which was inserted by an act of the Legislature ap-
proved April 15, 1880.

It is urged that this statute is a special law, and is violative
of the second subdivision of Section 25 of Article iv of the
Constitution of this State.   This section and subdivision pro-
hibit the Legislature from passing special laws "for the pun-
ishment of crimes and misdemeanors."   It is also urged that
it violates the last clause of Section 21 of Article i of the
Constitution, which is as follows:   "Nor shall any citizen or
class of citizens be granted privileges or immunities which
upon the same terms shall not be granted to all citizens;" and
it is further said to be violative of Section II of the same
Article, prescribing "that all laws of a general nature shall
have a uniform operation."

As is said by Judge Cooley, in his work on Constitutional
Limitations, "the Legislature is to make laws for the public
good," and further, "that what is for the public good, and
what are public purposes, and what does properly constitute
a public burden, are questions which the Legislature must de-
cide upon its own judgment, and in respect to which it is
vested with a large discretion which cannot be controlled by
the Courts, except, perhaps, when its action is clearly evasive,
and where, under pretense of a lawful authority, it has as-
sumed to exercise one that is unlawful." (Cooley's Con. Lim.,
156–7.)

The offense defined in the sections of the Code above quoted

is of the class *mala prohibita*.  Independent of statute, it is not an offense, and the Legislature in making the sections was merely adding to the class of public offenses which it deemed expedient should be prohibited by statute.  In making the exception in 301, it merely declared that in its judgment, there was something in the nature of the callings specified in such section, which rendered it improper to include them within the act.  The exclusion made by Section 301 was not arbitrary and the discrimination was reasonable. It was very easy to perceive that there are features in the character of the callings referred to in Section 301, and in their relation to the community in which they exist, which render such exclusion proper, and one upon which the Legislature might wisely exercise its judgment in leaving them unaffected by penal enactment.  Certainly, the Legislature is intrusted with an enlarged discretion to determine what shall be punished criminally and what shall not be, to fix upon what shall be put in the class of *mala prohibita*, and what shall not be included.

It is consistent with this view, to conclude and hold that such a law is a general one, uniform in its operation, and that by it no privilege or immunity is granted so as to bring it in conflict with the clause of the Constitution above referred to.

The classification made in Section 301 is based on reasonable grounds, and, as has been above remarked, is not arbitrary.  This will be readily recognized when we compare the callings excluded from prohibition with those made subject to it, so far as they are specifically mentioned in Section 300.  Let a comparison be made between hotels, boarding houses, barber shops, baths, markets, restaurants, taverns, livery stables and retail drug stores, specified in Section 301, and stores, workshops, bars, saloons and banking houses, specified in Section 300, and a difference in their essential features, as regards society and the health and comfort of those who constitute a community, will be at once admitted. Unless such a distinction is made, as has been by the provisions of Section 301, the Legislature, in endeavoring to preserve the health and physical well-being of the members of a community, would be exercising its power so as to put it in *peril.*

The circumstance that the callings excluded appear to form an exception from a general law in the shape which the legislation has taken, has given rise to the idea that the law contravenes the provisions of the Constitution. If the law had specified the kinds of business to which the prohibition extended, without mentioning those excluded, we do not think that the impression of its invalidity as conflicting with the paramount law, would have so taken possession of the minds of those who urge its unconstitutionality.

To hold such enactments unconstitutional and void would, in my judgment, impose an unwarrantable restriction on the legislative power. A kindred power is exercised in fixing the grades of criminality, as in the distinction between petit larceny and grand larceny, and classifying homicide and arson by degrees of criminality and affixing to each a different degree of punishment. Such a power is exercised in Section 304 of the Penal Code, where the act of erecting or keeping a booth, tent, stall, etc., for the purpose of selling or otherwise disposing of wine or spirituous or intoxicating liquors within one mile of any camp or field meeting, for religious worship, during the time of holding such worship, is made punishable by fine. Why confine the operation of such enactment to one mile? Why not extend it to one mile and a quarter? The Legislature is allowed to exercise its judgment as to the distance, and properly so.

Declaring the provisions of the sections referred to invalid as violative of the Constitution, would be to strike at the foundation of the legislative power to determine what acts, of those not *mala in se,* shall be punished criminally, and what shall not be punished. In most cases acts not *mala in se* are by statute declared penal offenses, while acts, apparently of a like nature, are not declared to be penal. What other power than the Legislature can or should draw the line, on one side of which is liability to punishment, and on the other side no such liability is incurred.

We are referred by the learned counsel to the case of *Ex parte Westerfield,* 55 Cal. 550, as determining the question that the law in question is a special law. The distinction between the Statute passed on in that case and the Sections 300 and 301 of the Penal Code is palpable. The former selected

a particular class, viz., "persons engaged in the business of baking for the purpose of sale,"and forbade them from laboring during a specified period. This was clearly a special law, and was properly held to be so. Every one engaged in any other calling or profession was permitted to labor. It may be further said that the discrimination by such act was not made on any reasonable grounds, but appeared to be entirely arbitrary. We observe nothing in the case cited in conflict with the views above expressed.

The contention that the "statute under consideration is in conflict with Sections One (1) and Four (4) of the first Article of the Constitution, was discussed and passed on in *Ex parte Andrews,* above cited. A statute, so far as the question to be passed on here is concerned, similar to the sections of the Penal Code above cited, was before the Court in that case, and its constitutionality was sustained. We concur in the views there expressed as to this matter, and deem it unnecessary to say anything further as to this contention.

As to the headings of the chapters in which Sections 300 and 301, Penal Code, are found, we cannot on a full consideration of them see anything to lead to a different conclusion from that reached therein. Granting that they may be resorted to to determine as to the correct interpretation of the sections included in the chapter (and nothing further, in our opinion, is determined in *Barnes* v. *Jones,* 51 Cal. 305), we cannot perceive that their headings are conclusive of the question of power of the Legislature to pass such statute. The Legislature may hold their power to enact a statute to be derived from a clause or section of the Constitution, which does not confer it. But such error would not render the law so passed unconstitutional, if the power to enact it was conferred by the organic law.

In my opinion the Act above referred to is constitutional, and the petitioner should be remanded to the custody of the officer.

MORRISON, C. J., concurring:

I concur in the judgment remanding the petitioner, and adhere to the views expressed by me in *Ex parte Burke* (59 Cal. 6).

MYRICK, J.:

For the reasons given by the Chief Justice in *Ex parte
Burke*, opinion filed October 31, 1881, in the dissenting opinion
in *Ex parte Newman*, 9 Cal. 502, in the opinion of this Court
in *Ex parte Andrews*, 18 id. 678, and *Ex parte Bird*, 19 id.
130, I think the petitioner should be remanded.    Field, J., in
*Ex parte Newman*, used the following language:

"The Legislature possesses the undoubted right to pass laws
for the preservation of health and the promotion of good
morals, and if it is of opinion that periodical cessation from
labor will tend to both, and thinks proper to carry its opin-
ions into a statutory enactment on the subject, there is no
power, outside of its constituents, which can sit in judgment
upon its action.    It is not for the judiciary to assume a wis-
dom which it denies to. the Legislature, and exercise a super-
vision over the discretion of the latter.    It is not the province
of the judiciary to pass upon the wisdom and policy of legis-
lation; and when it does so, it usurps a power never conferred
by the Constitution."

The people of this State, through their Legislature, have
declared in favor of the wisdom and policy of the law in
question.    They have declared their wishes in the matter.    If
the people now wish a change, if the public sentiment is now
other than it was, there is a plain, speedy and adequate rem-
edy, viz., by a repeal or modification of the law.    The Courts
should not declare a statute unconstitutional, unless it be
clearly so; where there is a doubt, that doubt should be
solved in favor of the expressed wishes of the people as given
in the statute.

I think it was competent for the Legislature to declare, as
it has done in Section 301 of the Penal Code, that the good of
society, public morals and health, will be promoted by ex-
empting hotels, boarding houses, barber shops, baths, markets,
restaurants, taverns, livery stables, retail drug stores, and such
manufacturing establishments as are usually kept in contin-
ued operation, from being affected by Section 300, and that
society, as it is constituted, needs the continued use of such
places for its well being.    Whatever may be individual opin-
ion from a religious standpoint, I cannot say, as a matter of

law, that a man will not be more benefited by bathing or by being shaved, or by having meals, or a drive, on Sunday, than he will by visiting a store, saloon or banking house. Such distinctions are for the consideration of the Legislature.

The religious element which is brought into the discussion or all these questions, by those who take extreme views on either side, has no proper place in this case. In some States Sunday laws are upheld from a religious point of view; in others from a secular point of view, only. In this State, the policy of the law, as indicated in the decisions, is fully committed to the secular phase of the subject, only. Therefore, there is no occasion to continually bring forward and urge the religious phase.

As to the effect to be given to the title and head line of the section in question: The Act considered by Field, J., and by him held good, in *Ex parte Newman,* was entitled "An Act to provide for the better observance of the Sabbath;" the Act sustained by this court in *Ex parte Andrews* and *Ex parte Bird, supra,* was entitled "An Act for the observance of the Sabbath." It is claimed, however, that greater force is to be given to head lines in the Codes than to the titles of Acts. The head line of Title ix of the Penal Code, containing the sections before us in the case at bar, reads: "Of crimes against the person and against public decency and good morals." The head line of the chapter reads: " Of crimes against religion and conscience, and other offenses against good morals." If there be any difference in substance between the titles of the former Acts and the head lines in the Code, it is in favor of the sections in question, because we may strike out the words " against religion and conscience and other offenses," in the head line to the chapter and leave it reading: " Of crimes against good morals" thus disregarding objectionable words, and retaining words and intentions unobjectionable. No Court has ever held that the Legislature may not pass laws to protect good morals. Whether good morals will be protected by cessation from secular employments on one day of the week, is for the Legislature to determine.

The head line of the title has no reference to religion, and does not indicate that the Legislature had religion in view; if the head line of the chapter is a part of the sections follow-

ing, and influences their construction,. the-- head line of the title is still larger and more comprehensive, and should also be considered.

It may be added that the sub-head line of the chapter, relating to Section 300, reads:

" 300. Keeping open places of business on Sunday," here again omitting the word "religion."

It may be that the Legislature, in inserting the words "against religion and conscience," in the head line of the chapter, had in mind Section 304, prohibiting the selling of liquors and other merchandise at any camp or field meeting for religious worship, and Section 302, prohibiting the disturbance of religious assemblages or worship. We cannot, as a matter of law, say that it did not intend to restrict the application of the word "religion" to those sections only. If the effect is to be given to head lines, which is claimed in this case, many of the provisions of the various codes must be held to be nugatory.

McKEE, J.:

I concur. Whatever may be urged against the policy of the law which is called in question in this case, is not a matter for the consideration of the Court. The policy or impolicy of the law belongs to the Legislature, whose will, as expressed by the law, is controllable only by the people. If the people consider a law impolitic or unwise, and desire its repeal, they must address themselves to their legislators. But so long as the law remains on the statute book, it is binding upon Courts and people; and it is only with its constitutionality that Courts have to deal.

The law under consideration is principally called in question because it is claimed to conflict with Section 4 Article i of the Constitution of the State, which declares that the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be guaranteed in this State. But, as I read it, the law simply expresses the intention of the Legislature to establish a day of rest from secular employments. It is not so expressed in exact terms, but that is unquestionably the reason and purpose of the law; for it regulates the observance of Sunday by

prohibiting acts to be done on that day, which, if done, would be contrary to public morals and decorum, and render nugatory the law which establishes the day as a secular institution.

Of the power of the State to establish such an institution, I think there can be no reasonable doubt. Under our free form of government, the Legislature of the State has authority, in the exercise of the police power of the State, to establish for the intercourse of the several members of the body politic with each other, those rules of good conduct and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own, so far as reasonably consistent with a correspondent enjoyment by others. "This," says Mr. Justice Cooley, "is a most comprehensive branch of sovereignty, extending, as it does, to every person, every public and private right, everything in the nature of property, every relation in the State, in society and in private life:" and for the regulation of the internal police of the State, it is a power which belongs exclusively to the State. (Cooley on Cons. Lim. 227.)

Of course a law passed in the exercise of this sovereign power must be in harmony with the will of the people, as expressed in their organic law. The one must explain or confirm the other. The enforceability of the statute law must be tested and verified by the Constitution. And the question arises, how or in what respect does the law under consideration, which as we have seen, simply establishes a day of rest as an institute of the State, interfere with the free exercise and enjoyment of the religious profession and worship of any of the religious groups within the limits of the State, or of any of their individual members ? Answer is made that the day set apart by the State for that purpose is Sunday or the Christian Sabbath, and that the observance of the day is made compulsory upon those who, under the authority of non-Christain Churches to which they belong, have to regard and keep sacred some other day than the Christian Sabbath, and therefore the law discriminates against them and in favor of Christians.

The argument seems to interpose the authority of churches against the power of the State—to exalt the inferior at the expense of the superior—the protected against its protector. But as between the State and religious bodies within the

limits of the State, the power of the State, under her organic law, is supreme.

By virtue of her sovereignty, the State has guaranteed freedom of religious opinion and worship to all religious bodies and people within her boundaries. But in granting those guarantees, she did not relinquish to religious bodies, nor divest herself of the power to establish a day of rest as a municipal institution for the people of the State. That power was reserved to be exercised over all the members of the body politic, without reference to whether they are Christians or Hebrews, followers of Confucius, of Guatama Buddha, of Mohamet or of Joe Smith ; or those who say in their hearts, " There is no God." Subject to that reservation, every citizen of the State is left free to his intellectual convictions and emotional fervors upon subjects of the *unknown* and *unknowable*. All are equal in the laws, in positions under the law, and in the administration of the Government. No legal distinction or discrimination can be made between them. But, thus protected, all are subject to the municipal institutions established by the State. And in establishing a day of rest as one of those institutions, the State has the right to determine what day ought to be set apart for that purpose, and how it ought to observed by the people. She is not bound by any constitutional obligations to the selection of any particular day. Any one day in seven, or in six, or in eight— either the first or the seventh day of the week, or any other day, may be appropriated by her for that purpose. Sunday is only a designation for the first day of the week ; and to deny the power of the State to set apart that day, or any other day, is to deny the power to set apart a day of rest as a municipal institution at all. But that is not contended. It is conceded that the power exists and is exerciseable, subject to the guarantees of the Constitution. It is only claimed that these guarantees have been invaded, because the legislation in question infringes upon the religious liberties of the Hebrews and the Seventh Day Adventists, and, it may be, other religious citizens, by making it compulsory upon them to observe a day which they are, by the authority of their churches and their consciences, forbidden to keep holy. In such views, men simply deceive themselves by words ; for the State has not set

apart Sunday for a day of rest as a *religious* institution; nor does she impose observance of the day upon churches or on church members, nor are religious commemorations or ceremonies prescribed or enforced. The duty of observing the day is imposed on the people of the State as members of the body politic, without reference to the religious faith and worship of any.

And as a day of rest, Sunday is not set apart as a *holy* day, but it is set apart as a legal holiday. As such the State has from the beginning appropriated it. On that day the business of her Courts and public offices is suspended; presentment of commercial paper, and services of legal notices and civil process, is disallowed; and in the computation of time for the performance of an act required by contract or law to be performed on a day which may happen to fall on Sunday, the day is excluded; and the people generally, without reference to faiths or creeds, have observed, and continue to observe it as such, unconscious that, as a municipal institution, it has ever invaded or violated any of their constitutional or religious rights.

But it is urged that the heading of the chapter of the Penal Code in which the law is contained demonstrates the unconstitutionality of the law, because the acts which are prohibited on Sunday are made offenses against religion, conscience and morals, and therefore the law discriminates in favor of the Christian religion against other religions.

The office of the heading of the chapter is simply to control, limit, and apply the provisions of the chapter. Ten sections in all comprise those provisions; two or three of them relate to the observance of Sunday or the Christian Sabbath (§§ 299, 300, 301), one of them to offenses against all religions (§ 302), and mostly all of them to offenses against good morals.

Considered as part of the chapter, I think there is no difficulty in ascertaining from the heading to what subjects the words of the heading relate, or in determining what the Legislature intended to prohibit as offenses against religion, conscience and public morals. Keeping in mind that the Code establishes the law of the State respecting all subjects; and that its provisions are to be liberally construed with a view

to effect the objects of the law and to promote justice, where is the violation of any provision of the Constitution in prohibiting, on a day established by the State as a day of rest, such acts of licentiousness, profanity and disorder as are calculated to shock the moral sense of the community, or to disturb the rest established by law ? It can only be, because the objector contracts such acts on that day to offenses against the Christian religion, and not against *his* religion ; and that the moral sense which may be shocked by acts done on that day is in a moral sense only from the Christian's standpoint.

But the acts are not prohibited as offenses against any religion—Christian or Pagan. It is true that the day on which they are prohibited is coincident with the Christian Sabbath; but as already shown, the State had the right to select that day or any other for a day of rest. And it may be conceded that the acts prohibited by the law on that day, are only prohibited because they are such as would be offensive to public morals, according to the standard of Christianity. But if the prohibition does not interfere with any man's liberty of conscience, it is no valid objection to the law, by which the Legislature has compelled the observance of the day, because it prohibits acts to be done which are deemed immoral according to the standard of one religion or another. Doubtless, the law was passed under the influence of Christianity. Assuming that it was, that in itself, should be no objection to the law by the Jew or the Gentile; for the religion of Jesus is closely connected with the religion of Moses—the one is but a development of the other, and pervades the ordinary political and moral life of the people; and the legislator, in the course and character of legislation, can recognize no other standard of moral ideas. As the prevailing religious opinion of the people public morals are largely dependent upon it.

The mere fact, then, that the mode of observing the day is enforced by the prohibition of acts which are offensive to public morals according to the standard of Christianity, affords no ground for constitutional objection to the law itself, if it does not violate the religious rights of others who do not call themselves Christians. But neither the religious profession and worship of the Jews, or of the Seventh Day

Adventists, or of any other religious association, are abridged by the law.

"There is," said Mr. Justice O'Neall, of the Supreme Court of South Carolina, in the year 1848, in language applicable alike to all religions as to the religion of the Hebrews, of which he was speaking, "no violation of the Hebrew's religion, in requiring him to cease from labor on another day than his Sabbath, *if he be left free to observe the latter according to his religion.* It is the seventh day which is to him a holy day, made so by his religion, and to be observed at his peril. All other days are to him indifferent. Hence he can find no abridgment of his religion in being compelled to abstain from public trade, employment, or business, on one of them. If the Legislature, or the city of Charleston, were to declare that all shops within the State or city should be closed, and that no one should sell or offer to sell any goods, wares, or merchandise, on the Fourth of July or Eighth of January in each year, would any one believe such a law was unconstitutional? It could not be pretended that religion had anything to do with that. What has religion to do with a similar regulation for Sunday? It is, in a political and social point of view, a mere day of rest; its observance, as such, is a mere question of expediency. But, says the argument on the other side, we should not object to it if it did not give a Christian a preference over an Israelite. Where is such a provision? There is none such in the law. It is general, operating upon all. The Constitution, in the respect under consideration, considers all the people of South Carolina, on whom the Government is to operate, as citizens merely. It does not divide them into Christians and Hebrews or any other classification. If the law be according to that, there is no objection. It is true, the Israelite must cease from business on Sunday; so do all others. His religion makes him also observe Saturday. That is not the effect of our law; it is the result of his religion, and, to enjoy its cherished benefits, living in a community who have appointed a different day of rest, he must give to its law obedience, so far as it demands cessation from public employment."

It is not necessary to dwell upon the objections that the law in question is special legislation, and does not operate

alike upon all classes. These objections have been satisfac-
torily disposed of by the learned opinion of the Chief Justice
of this Court in *Ex parte Burke*, (59 Cal. 6). I think the pe-
titioner should be remanded.

McKINSTRY, J., dissenting:

I dissent. Sections 300 and 301 of the Penal Code are:

"Sec. 300. Every person who keeps open on Sunday any
store, workshop, bar, saloon, banking house, or other place of
business, for the purpose of transacting business therein, is
punishable by fine not less than five nor more than fifty dol-
lars.

"Sec. 301. The provisions of the preceding section do not
apply to persons, who, on Sunday, keep open hotels, board-
ing houses, barber shops, baths, markets, restaurants, taverns,
livery stables, or retail drug stores, for the legitimate business
of each, or such manufacturing establishments as are usually
kept in continued operation; provided, that the provisions of
the preceding section shall apply to persons keeping open
barber shops, bath houses, and hair dressing saloons after 12
M., on Sunday."

The important question presented by the petition herein is
—Do the sections quoted conflict with the fourth section of
Article i of the Constitution of the State? The section of
the Constitution reads as follows:

"The free exercise of religious profession and worship,
without discrimination or preference, shall forever be guar-
anteed in this State; and no person shall be rendered incom-
petent to be a witness or juror on account of his opinions on
matters of religious belief; but the liberty of conscience
hereby secured shall not be so construed as to excuse acts of
licentiousness, or justify practices inconsistent with the peace
or safety of this State."

It has sometimes been suggested that laws like that we are
considering may be defended on the same ground as are laws
against blasphemy and other profanity. But until it can be
shown that any man in his sound mind pretends to believe
that indulgence in wanton and public blasphemy, or other
profanity, is necessary to the "free exercise and enjoyment"
of his religious profession or worship, he can not be heard to

claim the protection of the provision of the Constitution. The difference between the two classes of laws is rendered palpable by their comparison." "Sunday laws," have never been upheld in California on any other ground than that they simply provided for a period of rest.

In *Ex parte Andrews* (18 Cal. 678, 685), the conclusion to which the Court arrived was distinctly based upon the reasoning of the dissenting opinion of Mr. Justice Field, in *Ex parte Newman* (9 Cal. 502, 518). In the dissenting opinion referred to the Act of 1858 "for the better observance of the Sabbath" is declared not to be violative of the provision of the Constitution which allowed the free exercise of religion, because it simply required a periodical cessation from labor "tending to the preservation of health and the promotion of good morals." The cases cited by Mr. Justice Field all turn upon the same point. This will more clearly appear from an examination of the leading cases—*Spect* v. *Commonwealth*, 8 Barr. 312, and *City Council* v. *Benjamin*, 2 Strob. 529. In the first of these cases it was said that the statute of Pennsylvania then under consideration, only selected and set apart the first day of the week, or Sunday, as a day of *legalized rest*, and enforced the observance thereof by legal sanctions, and was, essentially, but a civil regulation. And in the South Carolina case, that religion had "nothing to do with" a prohibition of business on Sunday; that, in a political and social point of view, the prohibitory Act merely made the first day of the week a day of *rest*.

In view of the provision of the former and present Constitution prohibiting legislation which may discriminate against any form of religious profession or worship—the liberty of conscience intended to be secured by which is the more clearly defined by the clause that it shall not be construed to prohibit the prevention of licentious practices, or such as are inconsistent with the peace and safety of the State—I have never believed that a law which punishes as a crime the doing of any business, otherwise lawful, on Sunday, could be defended upon the ground on which such a law was attempted to be upheld in *Ex parte Andrews*.

Many years ago, in another place, I had occasion to say: "I confess I approach the question presented in this case with

a feeling of repugnance to such legislation as that upon which
this prosecution is founded." (The Act of 1858, "to prohibit
barbarous and noisy amusements on the Christian Sabbath.")
"Indeed, if the constitutionality of 'Sunday laws' were a
new question in this State, I should hesitate to sustain them.
Strictly speaking, no form of religion is *tolerated* in Califor-
nia. By the terms of the Constitution (of 1849), 'the free
exercise and enjoyment of religious profession and worship,
*without discrimination or preference*, shall forever be al-
lowed.' It is the absolute right, therefore, of every citizen to
worship God according to the dictates of his own conscience,
and to keep holy such days as his own religion may sanctify;
and it would be difficult to convince an 'orthodox' Jew (for
example), who has abstained from secular employment on
Saturday, that a law which compels him to refrain from like
employment on Sunday gives no preference to other forms of
religion. Certainly all argument based upon the supposed
physical benefits derived from a stated day of rest would
have little application and furnish little ground for enforcing
a 'Sunday law' upon one who has taken *his* rest on the pre-
ceding day." (*People* v. *Fritch*, in the County Court of San
Francisco.)

It is gratifying to know, that, in his exhaustive work upon
Constitutional Limitations, subsequently published, Mr. Jus-
tice Cooley did not hesitate to avow his conviction that a law
which prohibits ordinary employments upon the Sunday can-
not be sustained as a sanitary regulation, based upon the demon-
stration of experience that one day's rest in seven is needful
for the recuperation of the exhausted energies of body and
mind. The learned author says: "The Jew" (and we may
add the Seventh Day Baptist, of whom we take notice there
is a considerable number in California), "who is forced to ob-
serve the first day of the week, when his conscience requires
of him the observance of the seventh also, may plausibly
urge that the law discriminates against his religion, and, by
forcing him to keep a second Sabbath in each week, unjustly
though by indirection, punishes him for his belief. * * * It
appears to us that, if the benefit to the individual is alone to
be considered, the argument against the law which he may

make, who has already observed the seventh day of the
week, is *unanswerable.*" (Cons. Lim. 476-7, First Ed.)

Nor can the doctrine *stare decisis* be invoked to prevent us
from inquiring into the constitutionality of the sections of the
Penal Code. If, in *Ex parte Andrews* the act of 1858 was de-
cided to be valid, in *Ex parte Newman* (9 Cal. 502), the same
act was declared to be in conflict with the fourth section of
the first Article of the former Constitution. In holding the
sections of the Penal Code to be obnoxious to constitutional
objection, we but return to the rule which, for more than three
years, was the established rule in California. But if the case
*Ex parte Andrews* stood alone—"No such rule ever existed
as that a Court should be absolutely bound by a previous de-
cision. And it would be especially dangerous to apply this
inexorable standard to questions decisive of the constitutional
rights of the citizen." (*Houghton* v. *Austin,* 47 Cal. 666.)
It was said in *Willis* v. *Owen,* 43 Texas, 48: "When the de-
cisions relate not to matters of title or contract, but abstractly
to the structure of the Government, the limits of executive
and legislative power etc. the doctrine of *stare decisis* does
not apply." The last statement is certainly correct, unless it
can be shown that property interests have grown up under a
certain construction of the organic law of which there is no
pretense with reference to the provision of the Constitution
whose interpretation is to be considered in the present
case.

But a decision holding the sections of the Penal Code to be
repugnant to the constitutional inhibition of legislation of a
partial character with respect to religious profession and
practice, does not necessarily require a reversal of *Ex parte
Andrews.* The Act of 1858, there considered, was in the
usual form. It prohibited business, except of certain sorts,
on "the Christian Sabbath or Sunday," and was entitled: "An
act for the better observance of the Sabbath." I cannot ad-
mit to be satisfactory the reasoning by which the result was
reached, but the result was reached, that the words "Chris-
tian Sabbath" meant merely a period of time—the first day
of the week.

In the view of the Court the words were entirely without
ambiguity, so that there was no necessity to refer, and would

have been no propriety in referring to the title of the Act.
Thus construing the body of the Act, it was said that its only
scope and purpose was to establish, as a civil regulation, a day
of rest from secular pursuits. In the dissenting opinion, in
*Ex parte Newman*, much stress is placed upon the circum-
stance that there is nothing in the enacting clause of the Act
of 1858, to indicate that it was in the mind of the legis-
lators to enforce any religious observance. In that opinion
the words are *italicised*—" *It does not even allude to the sub-
ject of religious profession or worship in any of its provis-
ions.*" If the Act of 1858 had contained a distinct statement
that it was intended thereby to punish any person who should
be guilty of the irreligious act of performing labor upon the
" Christian Sabbath," the learned author of the dissenting
opinion might have arrived at a different conclusion touching
its validity. Construed according to established principles,
such a declaration in effect *is* contained in Sections 300 and
301 of the Penal Code.

The Penal Code is divided into parts, titles, chapters and
sections; and at the head of each chapter is a note indicating
generally the subjects to which the chapter is devoted. Sec-
tions 300 and 301 are found in chapter seven of title nine,
and the head note to this chapter is in these words: " Crimes
against *religion* and conscience, and other offenses against
good morals."

"While," as was said of the Practice Act in *Barnes* v. *Jones,*
" while the rule is well settled that the *title* of an act will not
control the language in the body of the statute, but may be
referred to as tending to explain the intention (only) when
the language is doubtful, we are of opinion that these head
notes are entitled to more consideration than the title to the
entire Act." (51 Cal. 303.)

" In this form of enactment, such statements " (at the head
of the respective chapters) " are a part of the law itself, and
not in any wise extrinsic to the enacting clause. To reject
them, or *to refuse to give effect to them,* according to their fair
and ordinary import and understanding, would be to make
the law, not to administer it." (*The People* v. *Molineux,* 53
Barb. Sup. Ct. R. 15; see, also, *Williams* v. *People,* 45 Id.
201.) In *People* v. *Molineux,* on appeal, (40 N. Y. 119), it was

said: "The whole of the first part of the Revised Statutes, including the definitions given in heads of the chapters and the title to the subject-matter following, was a single statute. Those headings are not *titles* of the acts, but are parts of the statute, limiting and defining their effect."

Thus considering the note in the head of the chapter as a portion of the chapter, it is to be pointed and applied to the several sections of the chapter *appropriately.* The sections in the chapter which prohibit certain acts upon the "Christian Sabbath," or Sunday, are intended to declare that these acts are not only violations of a sanitary regulation, but a desecration of a religious holiday, and, consequently, "crimes against religion." Other sections evidently are intended to be covered by the phrase "other offenses against morality."

In the sections of the Penal Code it is declared, therefore, that any person who shall neglect or refuse to observe, to the extent of a cessation from ordinary employments at least, a religious festival, recognized and celebrated by Christians alone, and not by all sects of Christians, is guilty of a crime against religion, to be punished as provided. As to the Jew, it is not a crime against *his* religion to labor on the first day of the week, and the plain purpose of the provision of the Constitution is to prohibit a legislative confusion which shall substitute the religious profession or worship of a class or sect for *religion.* Under penalty citizens are compelled by the sections of the Code, so to conduct themselves as is required not by their own, but by the religion of others.

The statute (reading the note which precedes the chapter in connection with the several sections comprised within it) declares it to be *a crime against religion* for any person not to refrain from certain secular employments upon Sunday; a word for which the words "Christian Sabbath" are used as an equivalent in the same chapter. To enforce such a law is in effect to punish for a disregard of a religious institution or ordinance; to enforce it against one whose religion attributes no sanctity to the institution or ordinance, but requires of him to keep sacred, as of binding obligation, another day in the week, is to discriminate against the free exercise of his religious profession and worship.

Ross, J.:

I dissent for the reason last given in the opinion of Mr. Justice McKinstry, that is to say, for the reason that the statute involved in this proceeding, fairly construed, makes the Act in question a crime against religion. It is a mistake to say that the present statute is like that involved in *Ex parte Andrews*, 18 Cal. 678, and in the other cases cited. The distinction which is an important one, has been clearly pointed out by Mr. Justice McKinstry and need not be repeated by me.

Sharpstein, J.:

I dissent. In *Ex parte Andrews*, 18 Cal. 678, the Court endeavored to avoid the objection that "the Sunday law" then in force was repugnant to that clause of the Constitution which declares that "The free exercise and enjoyment of religious worship, without discrimination or preference, shall forever be guaranteed in this State," by holding that it was within the power of the Legislature to make it a misdemeanor for any one to keep his place of business open for the transaction of business on any day of the week, and that "the power of selection being in the Legislature, there is no valid reason why Sunday should not be designated as well as any other day."

I cannot assent to the proposition that this law can be regarded as it would be if the day designated in it had not been the Sabbath of any religious sect, nor do I think that the Legislature would have the constitutional power to make it a misdemeanor for a person to keep his place of business open on any day other than the Sabbath of some religious sect, for the transaction of business which it would be neither illegal, immoral nor improper to transact on any other day than the one so designated.

First: Can the Legislature, in view of the provision of the Constitution above quoted, ignore the existence of religious sects in this State to the extent that the Court·in *Ex parte Andrews* holds that it may? If so, what force and effect is to be given to the words "without discrimination or preference?" There are in this State religious sects whose tenets

require them to suspend the transaction of business on the first day of each week, and other sects whose tenets require them to do so on the seventh day of each week. And it is held in *Ex parte Andrews* that the Legislature has the power to require a suspension of business on one day of each week, which it may designate for that purpose, because the physical and moral well-being of society is thereby promoted.

Now it is apparent that by selecting the first day of the week as a day of rest, the Legislature has discriminated in favor of those whose religious tenets require the observance of that day, and against those whose religious tenets require the observance of the seventh day. A member of the latter sect is required to observe two days, while a member of the former is only required to observe one day of each week. If the seventh day had been selected, the discrimination against those whose religion constrains them to observe the first day would have been equally plain. And if any other than the first or seventh had been selected, there would have been a discrimination against all sects whose religion exacts the observance of either the first or seventh day of each week. The law does not require that any one should live up to the requirements of his religion in this respect. But the Constitution does guarantee to every one the free exercise and enjoyment of religious worship without discrimination or preference, and it is plainly the duty of the Legislature to so frame its enactments that they shall not bear more heavily upon one sect than upon another, or upon those who profess religion than upon those who do not. As I read the constitutional guarantee, it not only requires that the Legislature shall recognize the existence of religious sects, but that it shall protect them in the exercise and enjoyment of religious worship without discrimination or preference.

Now, if it be necessary that people should rest one day in seven, and unnecessary that they should rest two days in seven, and wholly immaterial on what day they rest, it was the duty of the Legislature to take notice of the fact that many people are constrained by their religion to rest on the seventh day of each week, and to have excepted them from the operation of "the Sunday law." I do not think that there would have been any more impropriety in excepting

them from its operation than there was in excepting livery stable keepers from its operation. It was only by excepting from the operation of the law those whose religious convictions constrained them to observe some other day than the one designated in the Act, that it could be made to bear equally upon all classes of people. And a law which does not bear equally upon all classes of people is not without discrimination or preference. It is impossible for a person whose religion constrains him to observe the seventh day of each week, to live up to the requirements of his religion and at the same time obey this law, without sacrificing, one day more each week than the person whose religion constrains him to observe the first day of the week, or the one who is not constrained by religion to observe any day of the week. It does seem to me that this constitutes discrimination or preference, and as I understand the Constitution the Legislature has no power to pass such a law. It is no answer to , this objection to say that the law ignores religion altogether, because the Legislature has no right under the Constitution to ignore religion when passing laws which must seriously affect those who profess it in some one of its various forms. If it is only necessary that the people of this State should rest one day in seven, and wholly immaterial on what day of the week they rest, those whose religion requires them to rest on a day other than that designated in the Sunday law, should have been excepted from its operation in order to avoid discrimination or preference which the Constitution forbids.

Second: If this law is not inconsistent with the provision of the Constitution to which I have referred, is it consistent with all other provisions of that instrument?

In this State, at least, the validity of this law has been sustained on the sole ground that it is within the power of the Legislature to make it a misdemeanor for a person to keep his place of business open for the transaction of business on any day which it may designate, and that the fact of Sunday having been designated is an immaterial circumstance, in no way affecting the question of the constitutionality of the law.

CAL. REPS. LX—14

The principle is doubtless well settled, "that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability *that his use of it* shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community." (*Commonwealth* v. *Alger*, 7 Cush. 53, *per* Shaw, C. J.) And it is unquestionably within the power of the Legislature to impose such restraints upon the free use of property by its owner as may be necessary to prevent such use of it from being injurious to the rights of · others or of ·the community. Among the rights which the Constitution declares to be inalienable are those of. "securing, possessing, and protecting property," and it further declares that no person shall be deprived of "property without due process of law." A person who acquires property, acquires the right to use it, subject to "the implied liability that his use of it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community." " The term (property), although frequently applied to the thing itself, in strictness means only the rights of the owner in relation to it." (*Per* Selden, J., in *Wynehamer* v. *The People*, 13 N. Y. 378.) And one of the rights of an owner of property in relation to it is the right to use it. And any Act of the Legislature which interferes with the right of a person to use his own property within the limit above defined, deprives such person of one of his constitutional rights. And unless it can be shown that a person who keeps his place of business open for the transaction of business on every day of the week, thereby transgresses that limit, any law making it a misdemeanor for him to so keep it open on every day, would clearly be unconstitutional. I am assuming now that this law must be regarded precisely as it would be if the day designated had not been the Sabbath of any religious sect. If, then, it can not be seen or shown that a person by keeping his place of business open for the transaction of business on every day of the week, would cause any more injury to the rights of any other person, or those of the community, than he would by so keeping it open on six days every week, it seems to me that the Legislature could not constitutionally make it a mis-

demeanor for a person to keep his place of business so open on any day of the week.

"If the particular work or trade be not in its nature a nuisance, as prejudicial to the health or comfort of the public, it does not become so by being performed or carried on on one day, more than another." *Per* Ruffin, C. J., in *State* v. *Williams*, 4 Iredell, 400). In the same opinion the following passage occurs: "The truth is, that it. (work on Sunday) offends us not so much because it disturbs us in practicing for ourselves the religious duties, or enjoying the salutary repose or recreation, of that day as that, it is in itself a breach of God's law, and in violation of the party's own religious duty." He admits, however, that, "There are many offenses against God, which are not offenses against the State." And he says: "Although it may be true, that the Christian religion is a part of the common law, it is not so in the sense that an act contrary to the precepts of our Savior or Christian morals; is, necessarily, indictable. Those which were merely against God and religion were left to the correction of conscience, or the religious authorities of the State. Such, necessarily, must be the character of acts which are criminal only *in respect of the day on which they are done*, being a day set apart by the author of our religion for his peculiar service."

It is only in respect of the day on which they are done that the acts enumerated in the law under consideration are criminal. They may lawfully, and some of them must almost necessarily, be done on nearly all other days. Under our Constitution the Legislature has no power to enforce the observance of any day as a religious duty. The power of the Legislature to interfere with the use of property by its owner in proper cases can not be questioned. But when it does so interfere, and its power to do so is challenged by the owner, the duty of deciding whether such interference was reasonable or not devolves upon the Courts. If the Court is unable to discover any reasonable ground for such interference, it must decide that it was unconstitutional. And the only ground upon which a person can be deprived of the ordinary and lawful use of his property one day in seven is that such deprivation is necessary in order to protect other persons, or the community, in the enjoyment of their equal rights. That,

however, is not the ground upon which it is claimed that the constitutionality of this law can be supported. But it is claimed that it can be supported on the ground "that one day's rest in seven is needful to recuperate the exhausted energies of body and mind."

In a government modeled after the Republic of Plato, that would doubtless constitute a sufficient ground for legislative interference. But if the government has the power to do that, why should it not assume all the functions which Plato assigned to it ? In the language of Macaulay, " why should it not take away the child from the mother, select the nurse, regulate the school, overlook the play-ground, fix the hours of labor and recreation, prescribe what ballads shall be sung, what tunes shall be played, what books shall be read, what physic shall be swallowed—why should it not choose our wives, limit our expenses, and stint us to a certain number of dishes, of glasses of wine, and of cups of tea ? " Why should it not fix the hours of retiring at night and rising in the morning ? Experience has demonstrated that a certain number of hours sleep in every twenty-four are needful to recuperate the exhausted energies of body and mind.

In deference to public opinion, the Legislature of this State enacted what is known as the " Eight-hour law." The ground upon which that law was demanded was that experience had demonstrated that whoever labored eight hours in twenty-four required the other sixteen for the recuperation of the exhausted energies of his body and mind. But the Legislature did not attempt by that law to prevent any one from laboring more than eight hours a day. It simply declared that " eight hours of labor constitute a day's work, unless it is otherwise expressly stipulated by the parties to a contract." Now, I do not think that it would be seriously claimed that the Legislature would have the power to make it a misdemeanor for any person to keep his place of business open for the transaction of business more than eight hours a day, because experience had demonstrated that the other sixteen were needful for the recuperation of the exhausted energies of his body and mind. And yet it cannot be denied that such a law would be within the principle invoked by those

who maintain that the Sunday Law in this State is constitutional.

When the construction put upon the "eight-hour" clause of the San Francisco street law was before the Supreme Court, Sanderson, J., said: "It seems to me that to provide that a man shall not labor more than eight hours *in each day*, notwithstanding his own necessities, or the necessities of those who are dependent upon him may render it absolutely necessary for him to do so, would be to go much further than any legislative body has yet gone in regulating the exercise of the natural right of every man to labor for the support of himself and family, or for the purpose of acquiring, possessing, and protecting property." (*Drew* v. *Smith*, 38 Cal. 325.) But it would be going no further than the Legislature has gone in making it a misdemeanor for a person to keep open his place of business more than six days in each week for the transaction of business. And it is quite evident that Mr. Justice Sanderson saw that he was laying down a principle to which "Sunday laws" were no less repugnant than "Eight-hour laws.' For he immediately added: "That man shall not work on Sunday, seems to be considered by common consent to be a necessary and salutary rule, on the score of health, and, therefore, the Courts have held that Sunday laws are not an unreasonable interference with his natural right to labor and transact business; but who is prepared to say that a man shall not only not work on Sunday, but he shall not work more than eight hours in each of the other days of the week, or, in other words, that out of each one hundred and forty-four hours he shall not be allowed to work more than forty-eight hours, *under the pretense that to do so would injuriously affect and impair his general capacity for labor?*"

If it is simply a question of hygiene and the Legislature has the power to prescribe a regimen for the people of this State, every one should be prepared to say, what he evidently thought that no one was prepared to say. The circumstance that it seems to be considered by "common consent" a necessary and salutary rule "that man shall not work on Sunday" is not entitled to much weight in determining his constitutional right to do so. Something more than "common consent" is required before a man can be deprived of any of his

Constitutional rights. I do not doubt the constitutionality of the law which constitutes eight hours of labor a day's work, unless otherwise stipulated by the parties; nor do I doubt that it is within the power of the Legislature to constitute six days of labor a week's work, unless otherwise stipulated by the parties. But I think that it is beyond the power of the Legislature to make it a misdemeanor for a man to work more than eight hours a day, or more than six days a week, unless his doing so would injuriously affect the rights of others.

All the courts and law writers concur in basing the power of the Legislature to impose any restrictions or regulations upon the right of an owner to use his own property as he sees fit, upon the maxim, *sic utere tuo ut alienum non laedas*, which does not require that a man shall use his own property so as not to injure it or himself. And it has probably never been held, except in cases involving the validity of Sunday laws, that the Legislature could restrict or regulate the use of private property for any other purpose than that of preventing such use from becoming " injurious to the equal enjoyment of others having an equal right to the enjoyment of their property," or "injurious to the rights of the community."

Third: Is the constitutionality of this law an open question in this State ? In *Ex parte Newman*, 9 Cal. 502, a similar Act of the Legislature was held to be unconstitutional. Afterwards another Act of the same character was passed, which in *Ex parte Andrews, supra*, was held to be constitutional. In *Ex parte Bird*, 19 Cal. 130, the Court, on the authority of *Ex parte Andrews*, held the same Act to be constitutional. From that time to the present, embracing a period of more than twenty years, no effort to enforce the observance of the law appears to have been made, and no one who has lived in the State during that period will claim that the law has been even generally complied with. Many have devoted the day to religious exercises, some to recreation, and others to labor, and all apparently ignorant of the existence of this law. It does not seem to me that under such circumstances it can fairly be claimed that the question of the constitutionality of this law in this State is no longer an open one. The decisions upon that question in this State are not

uniform, and those which affirm the constitutionality of the law are based mainly upon the ground that such laws have quite uniformly been held to be constitutional in other States. But that, in my opinion, is not of itself a sufficient reason for construing any provision of our own Constitution-contrary to its obvious meaning.